# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

## No. 16-2613

**Gubala v. Time Warner Cable, Inc.**

On Appeal from the U.S. District Court for the Eastern District of Wisconsin
Case No. 2:15-cv-01078
The Honorable Pamela Pepper

**BRIEF OF *AMICI CURIAE* THE NATIONAL ASSOCIATION OF CONSUMER ADVOCATES AND PUBLIC JUSTICE SUPPORTING APPELLANT AND REVERSAL**

Daniel A. Schlanger
KAKALEC & SCHLANGER, LLP
85 Broad Street, 18th Floor
New York, NY 10004
Phone:  (212) 500-6114
Fax:  (646) 612-7996
dshlanger@kakalec-schlanger.com

Courtney L. Weiner
*Counsel of Record*
LAW OFFICE OF
COURTNEY WEINER PLLC
1629 K St., NW, Suite 300
Washington, DC 20006
Telephone:  (202) 827-9980
Fax:  (202) 379-9749
cw@courtneyweinerlaw.com

*Counsel for Amici Curiae National
Association of Consumer Advocates and Public Justice*

e

# APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: _____

Short Caption: _____

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[ ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

_____

_____

_____

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

_____

_____

_____

(3) If the party or amicus is a corporation:

   i) Identify all its parent corporations, if any; and

   _____

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

   _____

---

Attorney's Signature: _____  Date: _____

Attorney's Printed Name: _____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** _____

Address: _____

_____

Phone Number: _____  Fax Number: _____

E-Mail Address: _____

rev. 01/15 GA

**TABLE OF CONTENTS**

Page

I. INTEREST OF THE AMICI ................................................................................... 1

II. SUMMARY OF THE ARGUMENT .................................................................... 2

III. ARGUMENT ............................................................................................................ 4

    A. The CCPA Protects Against Invasion of Privacy ........................................ 4

        1. The Common Law Provides Standing for Invasions of Privacy ...... 5

    B. Congress Enacted the CCPA to Secure Specific Privacy Rights ................. 7

    C. The CCPA Protects Against the Risk of Harm from Disclosure ................. 8

IV. CONCLUSION ...................................................................................................... 11

# TABLE OF AUTHORITIES

Page

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)...................................................................................................11

*Denver Area Educ. Telecomms. Consortium v. F.C.C.*,
    518 U.S. 727 (1996).............................................................................................8, 10

*Florida v. Jimeno*,
    500 U.S. 248 (1991)...................................................................................................6

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)...................................................................................................8

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)...................................................................................................9

*Meese v. Keene*,
    481 U.S. 465 (1987)...................................................................................................8

*Parks v. IRS*,
    618 F.2d 677 (10th Cir. 1980) ...................................................................................5

*Parsons v. U.S. Dep't of Justice*,
    801 F.3d 701 (6th Cir. 2015) .....................................................................................8

*Pavesich v. New England Life Ins. Co.*,
    50 S.E. 68 (Ga. 1905)................................................................................................4

*Pichler v. UNITE*,
    542 F.3d 380 (3d Cir. 2008).......................................................................................5

*Snakenberg v. Hartford Cas. Ins. Co.*,
    383 S.E.2d 2 (S.C. Ct. App. 1989).............................................................................6

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016).......................................................................................*passim*

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998)..................................................................................................4, 5

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994).................................................................................................11

*United States v. Osage,*
    235 F.3d 518 (10th Cir. 2000) ...................................................................................6

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) .................................................................................................. 6

**FEDERAL STATUTES**

47 U.S.C. § 551 ................................................................................................................ 3

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 652A (1977) .................................................................. 4

Restatement (Second) of Torts § 652B (1977) .................................................................. 6

Stephanie Milot, "Time Warner Cable Warns Users of Possible Data Breach,"
  *PC Magazine* (Jan. 7, 2016) ............................................................................... 10 n.2

Elizabeth Weise, "200,000 Comcast accounts locked down,"
  *USA Today* (Nov. 9, 2015) ................................................................................. 10 n.2

Martyn Williams, "Cox to pay $595,000 for Lizard Squad data breach,"
  *PC World* (Nov. 5, 2015) .................................................................................... 10 n.2

## I. INTEREST OF THE AMICI

The National Association of Consumed Advocates ("NACA") is a nonprofit association of attorneys and consumer advocates committed to representing consumers' interests. Its members are private and public sector attorneys, legal services attorneys, law professors, and law students whose primary focus is the protection and representation of consumers. As a national organization fully committed to promoting justice for consumers, NACA's mission is to promote justice for all consumers by maintaining a forum for communication, networking, and information sharing among consumer advocates across the country, particularly regarding legal issues, and by serving as a voice for its members and consumers in the ongoing struggle to curb unfair or abusive business practices that affect consumers. No party or party's counsel authored this brief or contributed money to fund its preparation, and no person other than members of NACA contributed money to fund the preparation of this brief.

NACA was founded in 1994, by twelve pioneering consumer attorneys who saw a need to link advocates working in all disciplines of consumer law to effectively create a fair, honest, and open marketplace. Today, NACA has over 1,800 attorneys as members who represent and have represented hundreds of thousands of consumers victimized by fraudulent, abusive, and predatory business practices. As a national organization fully committed to promoting justice for consumers, NACA's members zealously advocate for a fair and open marketplace that forcefully protects the rights of consumers, particularly those of modest means.

NACA routinely participates as *amicus curiae* before federal courts in cases which impact the rights of the American consumer. Most notably, NACA submitted an

amicus brief in *Spokeo Inc. v. Robins*, 136 S. Ct. 1540 (2016) (arguing that the plaintiff sustained "real harm" sufficient to satisfy the injury-in-fact requirement to confer Article III standing). Consumer protection litigation, especially consumer class action litigation, often centers on questions of standing. NACA thus has a vested interest in advocating for the proper interpretation of the *Spokeo* decision in the courts of appeal. Because the application of the *Spokeo* decision is at issue here, NACA has a direct interest in this matter.

Public Justice is a national public interest law firm that pursues high-impact lawsuits to combat social and economic injustice, protect the Earth's sustainability, and challenge predatory corporate conduct and government abuses. Public Justice regularly represents consumers and workers with legal claims under federal and state laws that provide for statutory damages, particularly in cases where it can be difficult to quantify the monetary injury individuals have suffered. Public Justice has been involved in a number of cases where corporations have argued that individuals lack standing to pursue their claims, including filing an *amicus* brief with the U.S. Supreme Court on the side of the consumer-plaintiff in *Spokeo*.

## II.    SUMMARY OF THE ARGUMENT

The Supreme Court's opinion in *Spokeo, Inc. v. Robins* hews closely to its own precedent on Article III standing, breaking no new ground and reaffirming its prior holdings that an injury need not be tangible to be concrete. Critically, the Supreme Court, in *Spokeo* and in its other cases, gives particular recognition for Article III standing purposes to those rights with common law antecedents, including common law precedent for finding concrete harm based on conduct causing a risk of future injury.

The district court below erred by failing to recognize that the injury to privacy rights at issue here is directly analogous to privacy rights at common law, a history recognized by Congress when it passed the Cable Communications Policy Act ("CCPA"), 47 U.S.C. § 551, *et seq.*.[1] The invasion of the right to privacy itself, absent additional pecuniary or reputational harm, constitutes concrete injury under common law. In passing the CCPA, Congress aimed to protect against this inherent harm to consumer privacy. As a result, the invasion of privacy underlying the CCPA violations at issue in this case is sufficiently concrete to confer standing.

Moreover, Congress has identified numerous risks attendant to the retention of information by Appellee. As the Supreme Court explained in *Spokeo*, Congress is well positioned to assess such risks, and whether those risks amount to an injury deserving of statutory protection. With respect to the CCPA, Congress overwhelmingly determined that the risk was sufficiently high that it amounts to an injury. This Court should, therefore, defer to the judgment of Congress that the risk of harm underlying violations of the CCPA is sufficiently concrete that Appellants have Article III standing to bring such claims.

In short, *Spokeo* provides three separate bases for Appellant's standing: (1) he alleges an injury analogous to one traditionally recognized in common law; (2) Congress further identified this injury as one worthy of consideration; and (3) the substantial *risk* of further harm caused by the alleged conduct constitutes a cognizable injury in and of itself. Accordingly, the district court's ruling should be reversed.

---

[1] Amici does not argue the merits of any statutory violation. Standing exists independently of success on the merits. *See Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 585 (7th Cir. 2011) (standing addressed before reaching merits).

### III.    ARGUMENT

### A.    The Common Law Provides Standing for Invasions of Privacy

The Supreme Court held in *Spokeo* and previous cases that if "the common law permitted suit" in analogous circumstances, the plaintiff has suffered a concrete injury that can be redressed by a federal court. *Id.*; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) (explaining that Article III encompasses "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process").

The CCPA reflects only a recent statutory iteration of centuries of common law protection for privacy rights. Invasion of privacy is a quintessential "harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549; Restatement (Second) of Torts § 652A (1977) ("One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other."); *see id.* cmt. a (noting that "the existence of a right of privacy is now recognized in the great majority of the American jurisdictions"). Indeed, American courts at the turn of the century identified the right of privacy as "derived from natural law," and traced the concept back to Roman and early English legal traditions. *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 70 (Ga. 1905).

There can be no doubt that harms to an individual's privacy have traditionally been regarded as a cognizable basis for suit. The Supreme Court has repeatedly emphasized that historical practice "is particularly relevant to the constitutional standing inquiry," and "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process" fall within Article III's scope. *Vt. Agency of Natural Res. v.*

*United States ex rel. Stevens*, 529 U.S. 765, 774 (2000); *Steel Co.*, 523 U.S. at 102. Accordingly, privacy violations fall squarely within the zone of concreteness for standing purposes. As the Tenth Circuit has explained, the "common law tort of invasion of privacy" created a remedy for "personal wrongs which result[ed] in injury to plaintiffs' feelings and [were] actionable even though the plaintiff suffered no pecuniary loss nor physical harm." *Parks v. IRS*, 618 F.2d 677, 683 (10th Cir. 1980); *accord Pichler v. UNITE*, 542 F.3d 380, 398–99 (3d Cir. 2008) ("Courts permit recovery in privacy cases without proving actual damages because it is difficult to prove damages in such cases.").

1. <u>Common Law Recognizes Invasion of Privacy as an Inherent Harm</u>

The district court erred by failing to recognize that the invasion of Appellant's privacy rights has long constituted concrete harm in and of itself, even absent further monetary injury. Contrary to the district court's conclusion (A. 10-11), the existence of a privacy injury does not turn on proof of a separate (or further) injury, either monetary or otherwise. Rather, courts have routinely recognized the invasion of privacy *itself* as a distinct, concrete injury. *Spokeo*, 136 S. Ct. at 1549 ("[T]he law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure."); *see also id.* at 1551 (Thomas, J., concurring) ("In a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded . . . [so standing is] not contingent on a plaintiff's allegation of damages beyond the violation of his private legal right.").

Indeed, if Appellees retained Appellant's personally identifiable information associated with his cable account beyond the time authorized by Appellant and the CCPA, it violated Appellant's right to privacy in that information—the exact concern

5

protected by the common law. *See Intrusion Upon Seclusion*, Restatement (Second) of Torts § 652B (1977) ("One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy. . ."); *Snakenberg v. Hartford Cas. Ins. Co.*, 383 S.E.2d 2, 5 (S.C. Ct. App. 1989) ("The law recognizes that each person has an interest in keeping certain facets of personal life from exposure to others. This interest in 'privacy' is a distinct aspect of human dignity and moral autonomy."). Moreover, to the extent an individual authorizes intrusions on his or her privacy, those intrusions are limited to the scope and duration of the consent. *Cf. United States v. Osage,* 235 F.3d 518, 519-20 (10th Cir. 2000) (citing *Florida v. Jimeno*, 500 U.S. 248, 251-52 (1991)) ("When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent determines the permissible scope of the search.") Thus, even if Appellant cannot demonstrate specific pecuniary harm or other consequences from the improper retention of personal information, there should be little question that he has standing for CCPA violations based on this common-law analog alone. Thus, contrary to the district court's conclusion pecuniary loss, or the absence thereof, has no bearing on the harm to Appellant's privacy and the injury in fact he suffered.

Finally, the district court's conclusion that "the *Spokeo* plaintiff was a bit closer to alleging a concrete injury, because the defendant wasn't just keeping his information; it was publishing . . . inaccurate information" (A. 11) seems to suggest that *Spokeo* held dissemination of inaccurate information to be insufficiently concrete. However, as the district court noted elsewhere in its decision (A. 9), *Spokeo* reached no such conclusion concerning the cognizability of the allegations in that case. *See Spokeo*, 136 S. Ct. at

6

1550 (taking "no position" as to whether the plaintiff had pleaded an injury in fact). Rather, *Spokeo* remanded the action to the Ninth Circuit to apply a more "complete" analysis to the alleged facts in the first instance. (*Id.*)

The district court also conflated the reputational injury at issue in *Spokeo* – dissemination of inaccurate information about the plaintiff to the public – and the privacy invasion injury alleged in this CCPA case, which constitutes a cognizable injury in and of itself. Because this case involves an invasion of privacy constituting cognizable injury even absent further dissemination of the information, the district court erred in suggesting that further dissemination of information (as alleged in *Spokeo*) is required for an injury to be pleaded. The district court's failure to recognize the different nature of the harm pleaded in this case no doubt informed that court's erroneous judgment.

### B.     Congress Enacted the CCPA to Secure Specific Privacy Rights

The district court further erred in its inadequate recognition of Congressional judgment in identifying cognizable harm. "[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements," it may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo*, 136 S. Ct. at 1549. (quoting *Lujan*, 504 U.S. at 578). Just as common-law courts historically expanded the scope of legal rights without changing the essence of the legal claim, in the CCPA, Congress manifested its clear intent to extend common law privacy protections to the very type of intrusions at issue here. Congress determined that "the development of new and diversified services over interactive two-way cable systems should not impact adversely the privacy of the individual." S. Rep. 98-67, at 27. Congress specifically noted as the "principal potential problem" "the

7

opportunity to monitor subscriber viewing habits." S. Rep. 98-67, at 28. Indeed, the Supreme Court, in rebutting free speech concerns that might arise from the existence of a "list of those who wish to watch the patently offensive channel," cited the CCPA's prohibition on retention of personally identifiable cable viewing information. *Denver Area Educ. Telecomms. Consortium v. F.C.C.*, 518 U.S. 727, 834 (1996) (internal quotation marks omitted). Disclosure, though an independent violation, is not necessary where, as here, Congress has identified the harm in the cable company *itself* monitoring viewing habits beyond the scope of subscriber's —or *former subscriber's*—authorization. Thus, to the extent the privacy interests manifest in the CCPA were not actionable under common law, Congress, as it is permitted to do, *Spokeo*, 136 S. Ct. at 1540, extended that reach for purposes of Article III standing.

### C. The CCPA Protects Against the Risk of Harm from Disclosure

Finally, the district court took no heed of *Spokeo's* directive that concrete injury exists where violative conduct creates a *risk* of harm. *See Spokeo*, 136 S. Ct. at 1549. The district court's assessment that Appellant failed to plead concrete injury overlooks the risk-based injury that Congress has identified.

Congress was on firm ground in the CCPA in protection against risk to reputation. The U.S. Supreme Court has held that "a risk of injury to [one's] reputation," without more, is a sufficient injury for Article III standing. *Meese v. Keene*, 481 U.S. 465, 475 (1987); *see also Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 159 (1951) (Frankfurter, J., concurring) (noting that "this Court [has] recognize[d] [the] justiciability" of claims alleging "an immediate substantial harm to the reputations of petitioners"); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 711 (6th Cir. 2015)

8

("Reputational injury . . . is sufficient to establish an injury in fact."). *Remijas*, 794 F.3d at 693 (citing *Clapper,* 133 S. Ct. at 1147).

Even absent such a clear common law analog, the Supreme Court has recognized that the "judgment of Congress" plays an "instructive and important" role. *Spokeo*, 136 S. Ct. at 1549. The Court explained that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.* (quoting *Lujan*, 504 U.S. at 578); *see Massachusetts v. EPA*, 549 U.S. 497, 516-17 (2007) (citing this same passage, and noting that this congressional power "is of critical importance to the standing inquiry"). Even the late Justice Scalia commented that standing's "existence in a given case is largely within the control of Congress." Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 885 (1983). In addition to intangible harms, concrete harm may include "the risk of real harm," if a plaintiff's allegations are aligned with the harm that Congress "sought to curb." In those circumstances, a plaintiff "need not allege any *additional* harm beyond the one Congress identified." *Spokeo* at 1549–50.

In *Spokeo*, the Supreme Court applied a risk of harm analysis under the Fair Credit Reporting Act ("FCRA"). In the Court's view, a plaintiff who alleges that a company's violation of one of the FCRA's procedures either "cause[d] harm" or "present[ed] a material risk of harm" by pointing to evidence of Congress' own determination that the particular violation risks causing the targeted harm will likely "satisfy the demands of Article III." *Id.* The Court nonetheless warned that "it is difficult to imagine how the dissemination of an incorrect zip code, without more, could

9

work any concrete harm." *Id.*

Under the CCPA, Congress viewed the very *opportunity* to monitor an individual's viewing as a cognizable harm, leading to a cause of action distinct from disclosure. The separate provision aimed solely at retention highlights Congress's assessment that a compilation of information about an individual, on its own, created too great a risk of misuse of the information. *See Denver Area Educ. Telecomms. Consortium*, 518 U.S. at 834 (1996).

Indeed, in the era of data breaches, such risk-based restrictions on collection and retention seem prescient. In the last two years, three major cable companies have faced data breaches.[2] Moreover, just as courts have held that as victims of data breaches "should not have to wait until hackers commit identity theft or credit-card fraud in order to give the class standing," Appellant need not wait for a disclosure-related bad outcome to take action on personally identifiable information Appellee should no longer have at all.

Moreover, this Court need not decide for itself whether the risk is sufficiently severe or imminent; Congress, as opposed to the courts, is much better "positioned to identify intangible harms that meet minimum Article III requirements" by making predictive judgments about risks. *Spokeo*, 136 S. Ct. at 1549. In general, when Congress acts "in the first instance" to "determine whether and what legislation is needed," its

---

[2] *See* Stephanie Milot, "Time Warner Cable Warns Users of Possible Data Breach," *PC Magazine* (Jan. 7, 2016) *at* http://www.pcmag.com/article 2/0,2817,2497611,00.asp; Martyn Williams, "Cox to pay $595,000 for Lizard Squad data breach," *PC World* (Nov. 5, 2015) *at* http://www.pcworld.com/article/3002296/business-security/cox-to-pay-595000-for-lizard-squad-data-breach.html; Elizabeth Weise, "200,000 Comcast accounts locked down," *USA Today* (Nov. 9, 2015) *at* http://www.usatoday.com/story/tech/2015/11/09/comcast-200000-hackers-breach-lockdown/75470608/.

"conclusions are entitled to much deference." *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). Congress's "[s]ound policymaking" role "often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 665–66 (1994). Here, Congress assessed the risk of loss of control of personal information and of "Big Brother" tracking our habits. Its judgment resulted in the statutory penalties under the CCPA and concrete injuries under Article III for alleged violations.

## IV.   CONCLUSION

Amici respectfully requests this Court reverse the lower court's order granting Appellee's motion to dismiss.

Dated: October 11, 2016

                                                            Respectfully submitted,

Daniel A. Schlanger                          /s/ *Courtney Weiner*
Kakalec & Schlanger, LLP                  Courtney L. Weiner
85 Broad Street, 18th Floor                *Counsel of Record*
New York, NY 10004                        LAW OFFICE OF COURTNEY
Phone:  (212) 500-6114                    WEINER PLLC
Fax:  (646) 612-7996                       1629 K St., NW, Suite 300
dshlanger@kakalec-schlanger.com   Washington, DC 20006
                                                            Telephone:  (202) 827-9980
                                                            Fax:  (202) 379-9749
                                                            cw@courtneyweinerlaw.com

*Counsel for Amici Curiae National Association of Consumer Advocates and Public Justice*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,147 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 12-Point Times New Roman Font.

Dated: October 11, 2016

                                          Respectfully submitted,

                                          */s/ Courtner L. Weiner*
                                          Courtney L. Weiner
                                          LAW OFFICE OF COURTNEY
                                                  WEINER PLLC
                                          1629 K St., NW, Suite 300
                                          Washington, DC 20006
                                          Telephone:  (202) 827-9980
                                          Fax: (202) 379-9749
                                          cw@courtneyweinerlaw.com
                                          *Counsel for Amici Curiae National*
                                          *Association of Consumer Advocates and*
                                          *Public Justice*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 11, 2016, a true and correct copy of the foregoing brief was served electronically on all counsel of record via the CM/ECF system.

Dated: October 11, 2016

                                              Respectfully submitted,

                                              */s/ Courtner L. Weiner*
Courtney L. Weiner
LAW OFFICE OF COURTNEY
    WEINER PLLC
1629 K St., NW, Suite 300
Washington, DC 20006
Telephone: (202) 827-9980
Fax: (202) 379-9749
cw@courtneyweinerlaw.com
*Counsel for Amici Curiae National Association of Consumer Advocates and Public Justice*