Case No. 16-2613

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

**Derek Gubala,**

*Plaintiff-Appellant,*

v.

**Time Warner Cable, Inc.,**

*Defendant-Appellee.*

*On Appeal from the United States District Court
for the Eastern District of Wisconsin – Eastern Division
No. 2:15-cv-01078-PP
The Honorable Pamela Pepper*

**Brief of *Amicus Curiae* Electronic Privacy Information Center
in Support of Plaintiff-Appellant and in Support of Reversal**

Marc Rotenberg
    *Counsel of Record*
Alan Butler
Electronic Privacy Information Center
1718 Connecticut Ave. NW
Suite 200
Washington, DC 20009
Telephone: (202) 483-1140
rotenberg@epic.org

*Counsel for Amicus Curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 16-2613

Short Caption: Gubala v. Time Warner, Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Electronic Privacy Information Center (EPIC)

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   N/A

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      None

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      None

Attorney's Signature: s/ Marc Rotenberg          Date: October 11, 2016

Attorney's Printed Name: Marc Rotenberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ⊗   **No** ◯

Address: EPIC, 1718 Connecticut Ave. NW, Suite 200, Washington, DC 20009

Phone Number: 202-483-1140          Fax Number: 202-483-1248

E-Mail Address: rotenberg@epic.org

rev. 01/15 GA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................iii

INTEREST OF AMICUS ..................................................................................... 1

SUMMARY OF THE ARGUMENT ..................................................................... 2

ARGUMENT .......................................................................................................... 3

I.   The lower court failed to apply the *Spokeo* test: a plaintiff has standing when they allege an injury-in-fact fairly traceable to the defendant's conduct and redressable by a favorable court ruling. ............... 7

   A. Injury-in-fact is an invasion of the plaintiff's legally protected interest, not a consequential harm caused by an invasion. .................... 7

II.  The Cable Communications Policy Act protects concrete interests, and consumers have standing to sue when cable operators violate the Act. ........................................................................................................... 12

III. Imposing a consequential harm standard on claims brought to vindicate congressionally created rights violates the separation of powers. ................................................................................................... 14

CONCLUSION .................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Mineta*,
  534 U.S. 103 (2001) ........................................................ 23

*Allen v. Wright*,
  468 U.S. 737 (1984) ........................................................ 16

*Arizona Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011) ........................................................ 17

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013) ...................................................... 3

*In re Google Cookie Placement Consumer Privacy Litig.*,
  806 F.3d 125 (3d Cir. 2014) ................................................ 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) .................................................... 20

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ........................................................ 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) (Kennedy, J., concurring) ........................... 5, 21

*Maryland v. United States*,
  460 U.S. 1001 (1983) ....................................................... 18

*Metro. Life Ins. Co. v. Ward*,
  470 U.S. 869 (1985) ........................................................ 19

*Mistretta v. United States*,
  488 U.S. 361 (1989) ........................................................ 21

*Seminole Tribe of Florida v. Florida*,
  517 U.S. 44 (1996) ......................................................... 21

*Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ........................................................ 11

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ........................................................ 22

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ..................................... 3, 4, 9, 10, 12, 13, 19

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) (Thomas, J., concurring) ............. 4, 9, 10, 17, 18

*State of Ohio ex rel. Davis v. Hildebrant,*
  241 U.S. 565 (1916). ...................................................................... 22

*Sterk v. Redbox,*
  672 F.3d 535 (7th Cir. 2012) ........................................................ 22

*Susan B. Anthony List v. Driehaus,*
  134 S. Ct. 2334 (2014) ............................................................ 16, 18

*Tennessee Elec. Power Co. v. Tennessee Val. Auth.,*
  306 U.S. 118 (1939) ........................................................................ 8

*Thomas v. Union Carbide Agr. Prod. Co.,*
  473 U.S. 568 (1985) ...................................................................... 17

*Valley Forge Christian Coll. v. Americans United for*
  *Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) ...................................................................... 18

*Warth v. Seldin,*
  422 U.S. 490 (1975) ..................................................... 4, 9, 10, 13

*Whole Woman's Health v. Hellerstedt,*
  136 S. Ct. 2292 (2016) .................................................................. 19

*Williamson v. Lee Optical of Oklahoma Inc.,*
  348 U.S. 483 (1955) ...................................................................... 19

**STATUTES**

Cable Communications Policy Act, 47 U.S.C. § 551 (1984)

  § 551(b) ........................................................................................ 15

  § 551(c) ........................................................................................ 15

  § 551(e) ............................................................................... 5, 11, 15

  § 551(f) ................................................................................. 11, 15

15 U.S.C. § 6502 ............................................................................ 16

15 U.S.C. §§ 6801–02 ................................................................... 16

18 U.S.C. § 2710(e) ........................................................................ 6

47 U.S.C. § 338(i)(6) ................................................................. 6, 16

**OTHER AUTHORITIES**

22 Am. Jur. 2d *Damages* § 2 (2016) .............................................. 2

Al Pascual, Kyle Marchini, & Sarah Miller, *2016 Identity Fraud: Fraud Hits*
  *an Inflection Point*, Javelin (Feb. 2, 2016) .................................... 6

*Black's Law Dictionary* (10th ed. 2014) ............................. 2, 8, 11

Christopher Wolf, *Envisioning Privacy in the World of Big Data*, *in Privacy in the Modern Age* (Marc Rotenberg, Julia Horwitz, & Jeramie Scott eds., 2015)..............................................................................................7

F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275 (2008) .............................................................20

H.R. Rep. 98-934 (1984).......................................................5, 10, 11, 14

Identity Theft Resource Center, *Data Breach Reports* (Dec. 29, 2015)...................6

John Salmond, *Jurisprudence* (Glanville L. Williams ed., 10th ed. 1947)............. 11

LexisNexis Risk Solutions, *2014 LexisNexis Data Minimization: Balancing Business Needs with Consumer Expectations* (Oct. 2014)....................................7

Samantha Cowan & Sarah Pipes, *Data Minimization and Anonymization: Essential Tools for Reducing Privacy and Security Risk and Enhancing Trust*, Women in Security and Privacy (Aug. 10, 2016)......................................7

U.S. Const. art. III..............................................................................3

*Webster's Pocket Thesaurus of the English Language* (2001) ................................2

## INTEREST OF AMICUS[1]

The Electronic Privacy Information Center ("EPIC")[2] is a public interest research center in Washington, D.C.  EPIC was established in 1994 to focus public attention on emerging civil liberties issues and to protect privacy, the First Amendment, and other constitutional values.

EPIC frequently participates as *amicus curiae* in state and federal cases involving questions of consumer privacy and federal jurisdiction. *See* Mot. for Leave to File Amicus Br.

---

[1] In accordance with Federal Rule of Appellate Procedure 29, the undersigned states that no monetary contributions were made for the preparation or submission of this brief, and counsel for a party did not author this brief, in whole or in part.
[2] EPIC Appellate Advocacy Fellow John Davisson assisted with the preparation of this brief.

## SUMMARY OF THE ARGUMENT

"Injury is the illegal invasion of a legal right; damage is the loss, hurt, or harm that results from the injury." 22 Am. Jur. 2d *Damages* § 2 (2016). Despite this clear and important distinction, courts too often conflate injury-in-fact and consequential harm in the analysis of standing. This occurs frequently in privacy cases, as many defendants seek to exploit this semantic trick to avoid consideration of the plaintiffs' claims on the merits.[3] Not only is the analysis wrong as a matter of law, the conflation has led to increasing confusion about the necessary requirements to bring a lawsuit in federal court. And paradoxically, plaintiffs' standing claims in privacy cases are stronger than in many other cases; unlike in *Lujan*, there is a clear nexus between consumers in privacy cases and the companies that choose to collect their personal data. Time Warner Cable, Inc. ("TWC") caused a legal injury when it violated the Mr. Gubala's rights under § 551(e) ("Protection of Subscriber Privacy") after collecting his personal data. The lower court's refusal to recognize the legal injury is an attack on Congress's constitutional authority and raises significant separation-of-powers concerns.

---

[3] In common English, the terms "injury" and "harm" are considered synonyms. *Webster's Pocket Thesaurus of the English Language* 134 (2001). However, in the legal analysis of standing, the terms are clearly distinguishable. A legal injury is the "violation of another's legal right, for which the law provides a remedy." *Injury*, *Black's Law Dictionary* (10th ed. 2014). Harm, by contrast, is "material or tangible detriment." *Harm*, *id.*

**ARGUMENT**

Article III grants the federal courts "judicial power" over "cases" and "controversies." U.S. Const. art. III, § 2. The Supreme Court has interpreted this to embody the "fundamental" principle that "federal-court jurisdiction" is limited "to actual cases or controversies." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To effectuate this principle, the Court established the standing doctrine with an "injury-in-fact" requirement. *Id*. In actions brought by individuals against federal government agencies, the injury-in-fact requirement maintains the constitutional separation of powers by ensuring that "the undifferentiated public interest in executive officers' compliance with the law" is not converted by Congress into an "individual right" that might impede the executive's core duty to "take Care that the Laws be faithfully executed." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 577 (1992). The standing doctrine prevents "the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013), and "confines the federal courts to a properly judicial role," *Spokeo*, 136 S. Ct. at 1547. The doctrine also ensures that the plaintiff has "such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotation marks omitted).

3

Unlike in *Lujan* and other citizen-suit cases against government agencies, the injury-in-fact analysis is straightforward in a dispute between private parties arising under federal law. *See Spokeo*, 136 S. Ct. at 1550–52 (Thomas, J., concurring). As Justice Thomas explained in concurrence, "In a suit for the violation of a private right, courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded." *Id.* at 1551. The standing inquiry should play a minimal role in private litigation because there is no threat that the exercise of judicial power would "permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992).

Justice Kennedy also recognized in *Lujan* that Congress would create new rights to address "more complex and far reaching" policies in ways that "do not have clear analogs in our common-law tradition." *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring). He stressed that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before, and I do not read the Court's opinion to suggest a contrary view. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975)." *Id*. A court's exclusion of otherwise-valid claims would usurp Congress's authority to create legal rights.

In this case, Mr. Gubala has alleged that TWC violated his legal interest

under the Subscriber Privacy provisions of the Cable Communications Policy Act.

The pertinent provision states:

> (e) Destruction of information
> A cable operator shall destroy personally identifiable information if
> the information is no longer necessary for the purpose for which it
> was collected and there are no pending requests or orders for access to
> such information under subsection (d) or pursuant to a court order.

47 U.S.C. § 551(e). This data destruction requirement was enacted in direct

response to the "enormous capacity [of cable operators] to collect and store

personally identifiable information about each cable subscriber." H.R. Rep. 98-934

at 4666 (1984). Congress was wise to impose this obligation. In the years

following passage of the Cable Act, data breaches and identity theft have reached

epidemic proportions in the United States. *See* Al Pascual, Kyle Marchini, & Sarah

Miller, *2016 Identity Fraud: Fraud Hits an Inflection Point*, Javelin (Feb. 2, 2016)

(reporting that 13.1 million people were subject to identity theft in the United

States in 2015, resulting in $15 billion of fraud);[4] Identity Theft Resource Center,

*Data Breach Reports* 4 (Dec. 29, 2015) (reporting that 177 million records were

subject to data breaches in 2015).[5]

---

[4] http://www.idtheftcenter.org/images/breach/DataBreachReports_2015.pdf.
[5] https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point.

"Data minimization" is one of the critical policy choices adopted by Congress to safeguard American consumers from this threat. *See, e.g.*, 18 U.S.C. § 2710(e) (requiring data minimization by video rental companies); 47 U.S.C. § 338(i)(6) (requiring data minimization by satellite television providers). Data minimization involves "limiting [the] collection of personal data to the minimum extent necessary to obtain specified and legitimate goals" and "delet[ing] data that is no longer used for the purposes for which it was originally collected[.]" Christopher Wolf, *Envisioning Privacy in the World of Big Data*, *in Privacy in the Modern Age*, 204, 206 n.13 (Marc Rotenberg, Julia Horwitz, & Jeramie Scott eds., 2015). It is an "important traditional privacy practice." *Id.* at 206; *see also* LexisNexis Risk Solutions, *2014 LexisNexis Data Minimization: Balancing Business Needs with Consumer Expectations* 8 (Oct. 2014);[6] Samantha Cowan & Sarah Pipes, *Data Minimization and Anonymization: Essential Tools for Reducing Privacy and Security Risk and Enhancing Trust*, Women in Security and Privacy (Aug. 10, 2016).[7]

The lower court ignored entirely Congress's determination that a cable company's failure to minimize subscriber data is a concrete injury. Instead, the

---

[6] http://www.lexisnexis.com/risk/downloads/assets/Data-Minimization-Study-2014.pdf.

[7] https://www.wisporg.com/blog-posts/2016/8/10/data-minimization-and-anonymization-essential-tools-for-reducing-privacy-and-security-risk-and-enhancing-trust.

court held that the Plaintiff must show that "defendant has disclosed his
information to a third party" or that "he has been the victim of fraud or identity
theft." Decision and Order at 6. The lower court confused *consequential harm* and
*injury in fact*.

I.     **The lower court failed to apply the *Spokeo* test: a plaintiff has standing
       when they allege an injury-in-fact fairly traceable to the defendant's
       conduct and redressable by a favorable court ruling.**

       **A. Injury-in-fact is an invasion of the plaintiff's legally protected
       interest, not a consequential harm caused by an invasion.**

       Injury-in-fact, *legal injury*, requires the plaintiff to show they have suffered
an "invasion of a legally protected interest" that is (1) "concrete and
particularized" and (2) "actual or imminent, not conjectural or hypothetical."
*Lujan*, 504 U.S. at 560. Congress has the power to grant individuals legal rights,
the violation of which is a legal injury. A right is a "legally enforceable claim that
another will do or will not do a given act." *Right*, *Black's Law Dictionary*.
"[C]reated or recognized by law," *id.*, rights are granted through common law,
statutory law, and constitutional law. *Tennessee Elec. Power Co. v. Tennessee Val.
Auth.*, 306 U.S. 118, 137 (1939) ("[T]he right invaded is a legal right,—one of
property, one arising out of contract, one protected against tortious invasion, or one
founded on a statute which confers a privilege.").

       The invasion of a right, i.e., a *legal injury*, is distinct from the "disadvantage
that may flow from" an action. *Warth*, 422 U.S. at 503 n.13; *see, e.g.*, *In re Google*

7

*Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 134 (3d Cir. 2014) (finding that injury-in-fact "does not demand that a plaintiff suffer any particular type of harm to have standing"). As Justice Thomas recently explained in *Spokeo*, "our contemporary decisions have not required a plaintiff to assert an actual injury beyond the violation of his personal legal rights to satisfy the 'injury-in-fact' requirement." *Spokeo*, 136 S. Ct. at 1552 (Thomas, J., concurring).

### i. The *invasion* of a right must be concrete.

As the Court explained in *Spokeo*, there are two ways to show that an injury is concrete. First, an injury can be concrete if it "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at at 1549 (using "harm" to refer to the invasion of the plaintiff's legal right). Second, Congress can elevate "concrete, *de facto* injuries that were previously inadequate at law" to the "status of legally cognizable injuries." *Id.* (internal quotation marks omitted).

As the Court made clear in *Spokeo*, Congress has the authority to create legal rights, the violation of which confers standing. *"Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.* (internal quotation marks omitted). Justice Thomas stated the rule directly in his concurrence: "Congress can create new private rights and authorize private plaintiffs to sue based simply on the

violation of those private rights." *Id*. at 1553 (Thomas, J., concurring). As the Court recognized more than four decades ago, "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute." *Warth*, 422 U.S. at 514.

Congress granted consumers substantive rights in the Subscriber Privacy Provisions, and companies who violate one of those rights have caused an injury-in-fact. In enacting the Subscriber Privacy Provisions, Congress was "establish[ing] a policy to protect the privacy of cable subscribers" from the "enormous capacity [of cable operators] to collect and store personally identifiable information." H.R. Rep. 98-934 at 4666-67 (1984). Congress was acutely aware that disclosure of subscriber information could "reveal details about bank transactions, shopping habits, political contributions, viewing habits and other significant personal decisions" *Id.* at 4666. In prohibiting the retention of certain subscriber information and giving consumers the right to sue cable providers in breach, Congress created both a substantive right of privacy in the underlying information and a civil remedy to enforce it. 47 U.S.C. § 551(e) -(f).

Substantive law "creates, defines, and regulates the rights, duties, and powers of parties," while procedural law is "rules that prescribe the steps for having a right or duty judicially enforced." *Substantive Law*, *Black's Law*

9

*Dictionary*; *Procedural Law*, *Black's Law Dictionary*. In other words, "substantive law defines the remedy and the right, while the law of procedure defines the modes and conditions of the application of the one to the other." John Salmond, *Jurisprudence* 476 (Glanville L. Williams ed., 10th ed. 1947); *see Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010) (stating that procedural rights govern "only the manners and the means by which the litigants' rights are enforced").

But the Court in *Spokeo* made clear that a violation of procedural rights also creates legal standing. Writing for the Court, Justice Alito explained:

> Just as the common law permitted suit in such instances, the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified. See *Federal Election Comm'n* v. *Akins*, 524 U.S. 11, 20–25 (1998) (confirming that a group of voters' "inability to obtain information" that Congress had decided to make public is a sufficient injury in fact to satisfy Article III); *Public Citizen* v. *Department of Justice*, 491 U. S. 440, 449 (1989) (holding that two advocacy organizations' failure to obtain information subject to disclosure under the Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue").

*Spokeo*, 136 S. Ct. at 1549 (emphasis in original).

Only a "bare procedural violation, divorced from any concrete harm" fails to confer standing. *Spokeo*, 136 S. Ct. at 1549. But courts should not second-guess Congress's decision to establish new substantive rights in order to protect consumers and other individuals from harm. Congress conducts extensive

factfinding prior to the enactment of a public law, and the provisions, when read together, confer greater significance than when read in isolation. Courts should not presume, as the lower court did in this case, to label certain rights as "procedural" rather than "substantive" where Congress has not done so.

### ii. The invasion of a privacy right is particularized where the defendant has collected the plaintiff's personal data.

The particularity requirement of the injury-in-fact test is easily met in privacy cases that involve the purposeful collection and retention of the plaintiff's personal data by the defendant. Under the particularity requirement, the injury must "affect the plaintiff in a personal and individual way," where the plaintiff is "among the injured." *Lujan*, 504 U.S. at 560 n.1, 563 (internal quotation marks omitted); *see also Warth*, 422 U.S. at 501 ("[P]laintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.").

If the right belongs to the plaintiff, the invasion is particularized even if the invasion is also suffered by "a large number of people." *Spokeo*, 136 S. Ct. at 1548 n.7 (noting that even though "victims' injuries from a mass tort" are "widely shared," they still give rise to particularized injuries). If, however, the violated right is "possessed by every citizen," such as the "right . . . to require that the Government be administered according to law," then the injury is a general grievance that does not by itself give rise to standing. *Lujan*, 504 U.S. at 574

(internal quotation marks omitted); *see generally id.* at 573–77 (discussing generalized grievances). In a privacy case, the distinction is clearly made between those individuals about whom the defendant has gathered data and those whose data defendant did not possess. In this case, Mr. Gubala was a former customer of TWC and was entitled to precisely the protection offered under the Subscriber Privacy Provisions.

## II.    The Cable Communications Policy Act protects concrete interests, and consumers have standing to sue when cable operators violate the Act.

Congress enacted the Subscriber Privacy provisions to establish obligations for companies that collect and use personal data and to protect the privacy interests of cable subscribers. Legislators were understandably concerned about the potential misuse of sensitive personal information:

> Cable systems, particularly those with a 'two-way' capability, have an enormous capacity to collect and store personally identifiable information about each cable subscriber. Subscriber records from interactive systems can reveal details about bank transactions, shopping habits, political contributions, viewing habits and other significant personal decisions.

H.R. Rep. 98-934 at 4666 (1984). Congress was thus persuaded of the need to protect the personal information of cable subscribers:

> It is important that national cable legislation establish a policy to protect the privacy of cable subscribers. A national policy is needed because, while some franchise agreements restrict the cable operator's use of such information, privacy issues raise a number of federal concerns, including protection of the subscribers' first, fourth, and fifth amendment rights.

*Id.* at 4667.

Congress established strong protections for consumer privacy, restricting the collection, retention, and dissemination of subscriber data. The Subscriber Privacy Provisions prohibit cable operators from collecting "personally identifiable information" concerning any subscriber without prior consent unless it is necessary to render service or detect unauthorized reception. 47 U.S.C. § 551(b). The Cable Act also forbids operators from disclosing personally identifiable data to third parties without consent unless the disclosure is either necessary to render a service provided by the cable operator to the subscriber or if it is made to a government entity pursuant to a court order. § 551(c).

Section 551(e), the provision at issue in this case, stated clearly:

> A cable operator shall destroy personally identifiable information if the information is no longer necessary for the purpose for which it was collected and there are no pending requests or orders for access to such information under subsection (d) of this section or pursuant to a court order.

§ 551(e). The section also entitles "[a]ny person aggrieved by *any act of a cable operator* in violation of this section [to] bring a civil action in a United States district court" and permits the court to award "actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher." § 551(f) (emphasis added).

13

Nevertheless, the lower court improperly read a consequential harm requirement into § 551(e), faulting the Plaintiff for not "alleg[ing] that he has been contacted by marketers who obtained his information from the defendant, or that he has been the victim of fraud or identity theft." Decision and Order at 10. But Congress never qualified § 551(e) in this way. Congress simply said companies that collect personal data must delete the data after it is no longer needed. The aim is to prevent harms *before they occur*. This was an essential requirement of an effective privacy law and was adopted in many subsequent laws. 15 U.S.C. §§ 6801–02 (requiring minimization by companies collecting consumer financial data); 18 U.S.C. § 2710(e) (video rental data); 47 U.S.C. § 338(i)(6) (satellite television subscriber data); 15 U.S.C. § 6502 (data collected from children online).

## III.  Imposing a consequential harm standard on claims brought to vindicate congressionally created rights violates the separation of powers.

The doctrine of standing is "built on a single basic idea—the idea of separation of powers." *Allen v. Wright,* 468 U.S. 737, 752 (1984). By "identify[ing] those disputes which are appropriately resolved through the judicial process," *Lujan*, 504 U.S. at 560, standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). But the lower court's decision in this case raises serious separation-of-powers concerns because the decision "usurps" the power of the legislature to define legal injuries and remedies.

14

The Supreme Court has previously recognized separation-of-powers concerns in cases where a party sued to vindicate a *public* right, defined as a "matter[] arising between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 585 (1985). In such cases, a litigant must show that "he has sustained or is immediately in danger of sustaining some *direct* injury" from the challenged government action, "and not merely that he suffers in some indefinite way in common with people generally." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 135 (2011) (emphasis added). Standing doctrine thus "preserve[s] separation of powers by preventing the judiciary's entanglement in disputes that are primarily political in nature." *Spokeo*, 136 S. Ct. at 1550 (Thomas, J., concurring).

This particular threat to the separation of powers "is generally absent when a private plaintiff seeks to enforce only his personal rights against another private party." *Id.* at 1551 (Thomas, J., concurring). Where no act of government is in dispute, there is little chance that recognizing a plaintiff's standing will "usurp the powers of the political branches." *Susan B. Anthony List*, 134 S. Ct. at 2341. Indeed, "the province of the court is, solely, to decide on the rights of individuals[.]" *Maryland v. United States*, 460 U.S. 1001, 1005 (1983) (citing *Marbury v. Madison*, 5 U.S. 137, 170 (1803)).

15

Yet the separation of powers is equally offended when the court *denies* standing where Congress has duly authorized it—for example, by demanding that a plaintiff prove consequential harm in order vindicate a statutory right even though the statute imposes no such requirement. As the Supreme Court has repeatedly emphasized, "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *see also Lujan*, 504 U.S. at 560; *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 492 n.2 (1982). Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," and when it does, it may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo*, 136 S. Ct. at 1549.

A court, of course, is not empowered to override congressional judgments as to which injuries should be legally protected simply because they are "out of harmony with a particular school of thought." *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488 (1955). The Supreme Court has long rejected the view that the judiciary may "sit as superlegislature to judge the wisdom or desirability of legislative policy determinations[.]" *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 901 (1985).

But that is precisely the effect of unilaterally imposing a consequential harm standard on congressionally-created rights. When a court demands that a plaintiff prove some form of harm *beyond the injury that Congress has deemed actionable*, it is rejecting Congress's determination of what constitutes a bona fide injury and impermissibly "substitut[ing] its own judgment for that of the legislature." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016). "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014) (internal citation omitted). By doing so here, the lower court has subverted the core premise of the standing doctrine, converting a shield against judicial overreach into a sword for eviscerating legal rights created by Congress.

The lower court was presented with an injury that Congress made legally cognizable under the Cable Act—having one's personal information retained by a cable provider after it is no longer necessary—yet refused to acknowledge the legitimacy of the statutory prohibition. Decision and Order at 10. Instead, the court recast the Plaintiff's congressionally-established right as a "procedural" violation and concluded that he had failed to allege any "concrete" harm. *Id.* at 6.

First, this reflects an artificially narrow understanding of substantive rights: "Rights are not limited in their scope to harms, but also protect against conduct that might lead to harm." F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275 (2008). Just as a motorist can be cited for speeding without causing an accident, i.e. "consequential harm," so too can private rights protect against the mere *risk* of a particular harm without requiring that the harm come to pass.

Nor must a statutory right resemble a common law cause of action in order to confer standing. *See Lujan*, 504 U.S. at 580 (Kennedy, J., concurring) ("As Government programs and policies become more complex and farreaching, we must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition."). Courts long ago abandoned this mode of reasoning. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 166 (1996) (Souter, J., dissenting) ("It was the defining characteristic of the *Lochner* era, and its characteristic vice, that the Court treated the common-law background . . . as paramount," while viewing the congressional legislation on the same matters as "suspect.").

Moreover, in concluding that the injury identified by Congress was not sufficiently "concrete" on its own, the lower court "usurp[ed] congressional power" on the implicit ground "that Congress had mistakenly dealt with a subject

which was within its exclusive control[.]" *State of Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 570 (1916). It is not up to the court to introduce an actual damage requirement where Congress has not imposed one. "[W]here a dispute is otherwise justiciable, the question whether the litigant is a 'proper party to request an adjudication of a particular issue,' is one within the power of Congress to determine." *Sierra Club v. Morton*, 405 U.S. 727, 732 n.3 (1972).

Courts have long recognized their constitutional role as interpreters—not editors—of federal privacy statutes. In *Sterk v. Redbox*, for instance, this Court analyzed the structure of the Video Privacy Protection Act, 18 U.S.C. § 2710, to conclude that it does not contain a private right of action for a rental company's failure to destroy personal information. 672 F.3d 535, 538–39 (7th Cir. 2012). But in contrast to the lower court here, the Court in *Sterk* did not rewrite the statute to include a consequential harm requirement and deny itself jurisdiction for lack of standing. Rather, it exercised jurisdiction to reach the merits of the plaintiff's arguments, even though courts are "obliged to examine standing sua sponte where standing has erroneously been assumed below." *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001).

If courts are allowed to graft a consequential harm requirement onto standing doctrine, they will slam the courthouse doors on litigants who Congress

has expressly permitted to enter. The Court should reject the lower court's overreach and leave to Congress the work of defining statutory rights.

*     *     *

Post-*Spokeo*, courts must understand that injury-in-fact is a *legal injury*, distinct from *consequential harm*. If the claim is tied to the defendant's conduct and the matter is redressable by the court, it is necessary only to allege that a legal injury has occurred.

## CONCLUSION

EPIC respectfully requests this Court vacate the lower court's opinion.


October 11, 2016                              Respectfully submitted,

                                             */s/ Marc Rotenberg*
                                             _____
                                             Marc Rotenberg
                                             Alan Butler
                                             Electronic Privacy Information Center
                                             1718 Connecticut Ave. NW
                                             Suite 200
                                             Washington, DC 20009
                                             Telephone: (202) 483-1140

                                             *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of 7,000 words of Fed.

R. App. P. 29(d) and Fed. R. App. P. 32(B)(i). This brief contains 4,500 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This

brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the

type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been

prepared in a proportionally spaced typeface using Microsoft Word in 14-point

Times New Roman style. This brief has been scanned for viruses and is virus free

in compliance with 8th Cir. R. 28A(h).


                                          */s/ Marc Rotenberg*
Dated: October 11, 2016                   Marc Rotenberg

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Marc Rotenberg*

Dated: October 11, 2016                    Marc Rotenberg